UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    No.  4:18 CR 1007 AGF (JMB) |
| | ) |
| SHAUWN NETTLES, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Currently before the Court is Defendant Shauwn Nettles' Motion to Suppress Evidence.
[ECF No. 57]  The government opposes the motion.  Pretrial motions were referred to the
undersigned United States Magistrate Judge.  See 28 U.S.C. § 636(b).

**PROCECURAL BACKGROUND**

Nettles is charged by Indictment with the following offenses:  possession of one or more
firearms and ammunition by a previously convicted felon (Count One); possession with the
intent to distributed fentanyl (Count Two); and possession of one or more firearms in furtherance
of a drug trafficking crime (Count Three).  The charges flow from a traffic stop in the City of St.
Louis on October 26, 2018.

Nettles was arrested and had his initial appearance in December 2019.  At that time, the
Court appointed the Federal Public Defender to represent Nettles.  In April 2020, Nettles filed a
pro se motion for the appointment of new counsel.  On May 5, 2020, the undersigned held a
hearing on Nettles' motion for new counsel, terminated the Federal Public Defender's
appointment, and appointed Peter Cohen, an experienced attorney on the Court's Criminal

Justice Act ("CJA") panel.  On September 28, 2020, defense counsel filed the instant Motion to Suppress.  On October 13, 2020, after receiving the government's opposition, the Court set the matter for an evidentiary hearing on November 12, 2020.  Due to the Coronavirus pandemic and a serious surge in infections locally and nationally, and upon Nettles' motion, the undersigned vacated the evidentiary hearing and continued the matter.

The evidentiary hearing was eventually held on March 31, 2021.  Nettles was present with Mr. Cohen, and the government was represented by Assistant U.S. Attorney J. Christian Goeke.  The government presented the testimony of St. Louis Metropolitan Police Department Officer Quincy Smith.  The government also introduced the following exhibits:  an annotated Google map of the area of the traffic stop (Gov't Exh. 1); a REJIS wanted person printout for Nettles (Gov't Exh. 2); a Missouri Uniform Citation form for a traffic violation (Gov't Exh. 3); a REJIS Court record for the traffic violation indicating a guilty plea (Gov't Exh. 4); and a CD with relevant police radio recordings (Gov't Exh. 5).  [See ECF No. 67]

Following the evidentiary hearing, Nettles' attorney requested leave to file a post-hearing memorandum.  On April 20, 2021, defense counsel filed Nettles' memorandum.  [ECF No. 70] On April 26, 2021, the government filed a post-hearing memorandum.  [ECF No. 73]

On April 22, 2021, Nettles filed a pro se motion to dismiss Mr. Cohen.  [ECF No. 71]  On April 28, 2021, the undersigned held a hearing on Nettles' pro se motion.  In his motion and at the April 28th hearing, Nettles argued that the government's attorney tampered with the evidence against him and that defense counsel failed to adequately object to that evidence.  Nettles also argued that his attorney allowed the government to present false testimony from an impeached witness.  Nettles explained, in substance,[1] that the radio recording that was presented at the

---

[1] Nettles was very animated during the hearing, often interrupting the Court and talking

evidentiary hearing was not accurate.  Nettles referenced a transcript or recording that his prior attorney gave to him that did not match the radio transmissions.  The undersigned explained to Nettles that the Court had already allowed him to replace his prior attorney and that it appeared that his current attorney was providing adequate counsel.  Nonetheless, the undersigned directed that Nettles' attorney submit a copy of the radio timeline/transcript at issue so that the Court could compare it to the recording submitted at the hearing.

Defense counsel filed a copy of the timeline [ECF No. 76] and the undersigned listened to Gov't Exh. 5 and compared the radio traffic to the timeline/transcript.  The timeline/transcript was not complete—it only covered the beginning of the police recording[2]—but it matched the radio traffic provided by the government (Gov't Exh. 5) for the portion it covered.

On May 21, 2021, the undersigned held another hearing on Nettles' pro se motion to dismiss counsel.  At that hearing, the Court confirmed with the attorneys that there were no other recordings and that the timeline/transcript was accurate for the time portion of the radio traffic it covered.  The Court again reviewed with Nettles' his issues, but the undersigned found that Nettles' contentions in his pro se motion were not founded.  Specifically, the undersigned found that the government's attorney did not tamper with any evidence and that Mr. Cohen had not acted improperly nor had he allowed the government to introduced false testimony.  The undersigned also explained to Nettles the consequences of seeking yet another attorney.[3]  Those

---

over others.  Nettles' conduct made it difficult to interact with him and discuss the details of his arguments.

[2] The timeline/transcript ends with the following "left off 5:18," correctly reflecting that the transcript only covered the first five minutes and eighteen seconds of the police recording.

[3] Nettles was again animated an agitated at the hearing, making it difficult to communicate effectively with him.  The undersigned finds, however, that Nettles appeared competent and understood his circumstances and options.

consequences included a potential delay in resolving his case, and that the undersigned would not allow a new attorney to file additional pretrial motions because the instant Motion to Suppress was fully briefed and ready for disposition.  Knowing the consequences, Nettles persisted in his request for a new attorney.  Based on the entire record, the undersigned concluded that the relationship between Mr. Cohen and Nettles was broken beyond repair, and that allowing Mr. Cohen to withdraw and appointing new counsel would be in the best interests of justice and allow Nettles' case to proceed as efficiently as possible.  Accordingly, the Court granted Nettles' pro se motion for new counsel and appointed CJA counsel John Lynch to represent Nettles.[4]

Based on the testimony and evidence from the evidentiary hearing, having had the opportunity to observe the demeanor and evaluate the credibility of the witness, having carefully reviewed the exhibits, and having fully considered the parties' arguments and written submissions, the undersigned makes the following findings of fact, conclusions of law, and recommendations.

## FINDINGS OF FACT

Quincy Smith is an officer with the St. Louis Metropolitan Police Department ("SLMPD").  As of the evidentiary hearing, he had been with the SLMPD for about eleven years.  Officer Smith is assigned to the "Mobile Reserve" unit within the SLMPD and was with that unit in October 2019.  According to Officer Smith, Mobile Reserve officers are not limited to a particular area or zone within the City of St. Louis.  Rather, they are deployed to high crime neighborhoods and assisted other officers.

---

[4] On June 1, 2021, Nettles' filed two pro se pleadings which the undersigned addressed in a written order.  [ECF No. 84]

During the morning and afternoon of October 26, 2018, Officer Smith was on duty with Officer Martinous Walls.  The officers were operating in far south St. Louis City in a marked patrol vehicle.  Officer Smith was driving.  During their patrol, Officers Smith and Walls were asked to assist a Drug Enforcement Investigative ("DEI") unit that was actively surveilling a house on Davis St.  Officer Smith explained that Mobile Reserve officers routinely assisted DEI investigations and that Mobile Reserve officers conducted traffic stops upon request.

On October 26th, Officer Smith communicated with DEI investigators via radio-to-radio communication over a "narc vice channel."  (Tr. at 8)  The DEI investigators asked Officers Smith to establish a position in the area of South Broadway and Tesson.  The DEI team radioed an interest in two vehicles—a maroon Tahoe and a black Malibu.  Eventually, the DEI investigators requested a traffic stop of the black Malibu, reporting that the vehicle was traveling south on Michigan.  As a result, Officer Smith drove in his patrol car and eventually began following the Malibu south on Michigan.

Officer Smith testified that, as he followed the Malibu, he observed the vehicle violate a stop sign at the intersection of Michigan and Davis.  According to Officer Smith, the brake lights did not illuminate.  Officer Smith testified that, as the Malibu was about to turn west on Hurck St., the officers activated their vehicle's lights and siren to initiate a traffic stop.  The Malibu did not immediately pull to the curb, but rather continued about an additional block before pulling into a driveway at 426 Hurck.[5]

Officer Smith testified that the officers were concerned that the driver of the Malibu might be trying to flee.  Officer Smith also testified that the brake lights were working when the

---

[5] Government Exh. 3 indicates that the car was a 2013, four door, Chevrolet Malibu, and that the traffic violation occurred at 12:57 p.m.

Malibu stopped in the driveway.  The government introduced a Google Maps depiction of the route of travel to assist the Court in visualizing the sequence of events at issue.  (Gov't Exh. 1)

Officer Smith explained that, as the officers exited their police vehicle, the driver and sole occupant of the Malibu, who was later identified as Defendant Shauwn Nettles, rolled down the window.  Officer Smith approached the driver's side of the Malibu.  As Officer Smith approached, he observed Nettles "bending at the waist, towards the steering wheel."  (Tr. at 14)  Officer Smith testified that, based on his police experience, he had concerns because it appeared that Nettles was trying to conceal something under the seat.  Officer Smith acknowledged that he did not know what the item might have been.  Additionally, as he approached the Malibu, Officer Smith smelled a strong odor of marijuana coming from the car.  During cross-examination, Officer Smith explained that he did not see smoke but that he could smell fresh or burnt marijuana, and that he was at the rear of the vehicle when he noticed the odor.

Nettles provided Officer Smith with his driver's license.  Officer Smith conducted a computer inquiry and discovered that there was a felony wanted for Nettles relative to a domestic assault matter.  At the hearing, the government submitted a computer printout, documenting that there was an active wanted for Nettles, out of the First District of the SLMPD, for domestic assault.  (Gov't Exh. 2)  No specific facts relating to the domestic assault were offered at the evidentiary hearing.  For example, it is not known whether Nettles was the suspect or a witness in the alleged domestic assault matter.  Therefore, the basis for the wanted remains unknown to the Court.

As a result of the wanted, Officer Smith arrested and handcuffed Nettles.  Officer Smith conducted a pat down search of Nettles, and Nettles advised the officer "that he had some weed in his pocket," which Officer Smith seized.  (Tr. at 17-18)  Officer Smith testified that, at the

time of the events in question, marijuana was illegal in Missouri.  Officer Smith did not believe it was a felony quantity of marijuana that he seized from Nettles' pocket.

Officer Smith next searched the Malibu.  He explained that, based on his training and experience, he had three reasons for searching the vehicle—the strong odor of marijuana, Nettles' bending and possibly trying to conceal something, and that Nettles did not immediately pull over "like a normal person" when the police initiated the traffic stop.  (Tr. at 18)[6]  During the search of the Malibu, Officer Smith located and seized a loaded Smith & Wesson .40 caliber pistol from the driver's side floorboard, under the seat near the handle used to move the seat back and forth.  The gun was not visible to Officer Smith as he approached the vehicle.  From the passenger side, Officer Smith seized a grocery bag which contained a blender, a blue pouch with a rubber band with powder or residue on it, a blue and black capsule, and empty clear capsules.  Officer Smith testified that fentanyl and heroin are cut with "Dormin" and then placed in capsules such as those located in the Malibu.  After the search, Officer Smith agreed to relinquish custody of the Malibu to Nettles' girlfriend's father.[7]

Nettles was conveyed to the St. Louis City Justice Center and booked on gun and drug charges.  He was also issued a citation for the stop sign violation.  (Gov't Exh. 3)  The government offered a computer record documenting that Nettles entered a plea of guilty to the traffic citation on December 11, 2019.  (Gov't Exh. 4)[8]

---

[6] During cross-examination, Officer Smith also testified that he could still smell the odor of marijuana after he removed Nettles from the vehicle.

[7] At the hearing, it was not clear who owned the Chevrolet Malibu, but it appears that it was registered to either Nettles' girlfriend or her father.  (See Tr. at 50)  Officer Smith also testified that, if he did not have probable cause to search the vehicle, he would have conducted an inventory search prior to relinquishing it to a third party to avoid leaving any items that might harm the public.

[8] Nettles' attorney highlighted that the disposition did not indicate that any sentence was

In support of Officer Smith's testimony, the government offered a CD that contained recordings of the police radio traffic from the events in question.  (Gov't Exh. 5)  The CD included relevant radio-to-radio transmissions over the Narc-Vice channel, as well as dispatch communications between Officers Smith and Walls over a channel referred to in Court as the "SOD" channel.  Officer Smith explained that his Mobile Reserve unit used the SOD channel to get numbers and to call out the traffic stop.  According to the testimony and evidence, the first relevant recording occurred on the Narc-Vice channel at about 10:55 a.m. on October 26, 2018, and the last relevant recording occurred on the SOD channel at about 1:14 p.m.  (See Tr. at 29) The stop sign violation occurred at 12:57 p.m.

The undersigned has reviewed the recording of the radio traffic submitted at the evidentiary hearing (see Gov't Exh. 5) and it corroborates Office Smith's testimony.  The recording on the Narc-Vice channel begins at 10:55 a.m.  The Narc-Vice recording is consistent with Officer Smith's testimony that police officers were engaged in surveilling drug trafficking activity and seeking assistance from other officers with monitoring certain vehicles.  As the Narc-Vice channel recording continues, the officers involved become increasingly interested in two vehicles, a maroon Tahoe and a black Malibu.  The license plate called out for the Malibu was "KM0 632" which matches the license plate on the Malibu Nettles was driving.  The recording also includes communications among the police officers indicating that the driver of the Malibu was engaged in suspicious activities.  For example, the recording notes that Nettles, while driving the Malibu, dropped off a female at the suspected drug location.  Similarly, the recording includes a discussion of suspicious activity at a corner store involving Nettles.  The Narc-Vice channel recording also confirms the direction of travel described by Officer Smith and

---

imposed.

depicted in Government's Exhibit 1.  The recording further reflects that Nettles parked the Malibu at 426 Hurck and that the officers had some concerns that he might "take off."  The Narc-Vice recording does not reflect any traffic violation information.

The recording of the SOD channel consists mostly radio calls from unrelated police matters.  The recording clearly reflects that, at 1314 hrs (1:14 p.m.) a radio request was made for a ticket relative to a matter at 426 Hurck.  In response, a dispatcher provided a ticket number of "051045."  This information is consistent with the traffic ticket issued to Nettles and Officer Smith's testimony.  (See Gov't Exh. 3)

Additional findings of fact are included in the discussion below.

## DISCUSSION, CONCLUSIONS OF LAW, AND RECOMMENDATION

### I.    Summary of Issues Raised

Nettles asks the Court to suppress all evidence seized as a result of the October 26, 2018, traffic stop.  Nettles contends that he did not commit the alleged traffic violation.  Nettles also argues that the traffic stop was a pretext conducted at the behest of DEI detectives to further a narcotics investigation.  Finally, Nettles argues that the traffic stop was impermissibly prolonged and that police lacked any constitutional basis for searching his car during the traffic stop.

The government counters that the police observed Nettles commit a stop sign violation and, therefore, the traffic stop was constitutional.  The government argues that the odor of marijuana emanating from Nettles' car provided probable cause to search the vehicle pursuant to the automobile exception to the Fourth Amendment's warrant requirement.  The government also contends that the police could also search Nettles' car for safety purposes because Officer Smith observed Nettles making furtive movements consistent with attempting to conceal something.  Finally, in its post-hearing memorandum, the government contends that, even if the

traffic stop was unconstitutional, the outstanding wanted discovered during the traffic stop attenuated the taint of the stop pursuant to Utah v. Strieff, 136 S. Ct. 2056 (2016).

## II.    **Analysis of Issues**

### A.    **Was the Traffic Stop Constitutional?**

A fundamental issue in this matter is whether the police lawfully stopped Nettles for a traffic violation.  This is a Fourth Amendment issue.

An officer's decision to stop a car is "reasonable" for Fourth Amendment purposes if the officer has "probable cause to believe that a traffic violation has occurred."  Whren v. United States, 517 U.S. 806, 810 (1996); see also United States v. Espinoza, 885 F.3d 516, 522-23 (8th Cir.), cert. denied, 138 S. Ct. 2694 (2018).  The seriousness of the violation is not a basis to challenge a traffic stop.  See United States v. Miller, 915 F.3d 1207, 1209 (8th Cir. 2019) ("A violation of traffic law, even a minor violation, is sufficient probable cause to support a stop.") (citation omitted).  When the police have probable cause to believe a motorist has committed a traffic violation, they may temporarily detain that motorist, regardless of the officers' subjective motivations for making the stop.  See Whren, 517 U.S. at 812-13; United States v. Frasher, 632 F.3d 450, 453-54 (8th Cir. 2011).

In his suppression motion as filed, Nettles contends that he did not commit the alleged stop sign violation.  It is not disputed that Officer Smith pulled over the Chevrolet Malibu for a traffic violation.  It is not disputed that Nettles was the driver and sole occupant of the Malibu.  Officer Smith testified about the facts and circumstances leading up to the traffic stop.  In addition to Officer Smith's testimony, the government submitted a map depicting the sequence of events, as well as radio communication and traffic citation evidence that was consistent with Officer Smith's testimony.  The undersigned credits Officer Smith's testimony that he observed

Nettles fail to stop at a stop sign at the intersection of Michigan and Davis in the City of St. Louis.[9]  Furthermore, the government submitted evidence (see Gov't Exh. 4) indicating that Nettles pled guilty to the traffic violation.

The undersigned finds that Officer Smith had probable cause to believe that Nettles committed a traffic violation and his decision to conduct a traffic stop of Nettles passes Fourth Amendment muster.  See Miller, 915 F.3d at 1209.  The fact that Officer Smith conducted the traffic stop at the behest of narcotics detectives for purposes unrelated to traffic safety is not relevant to the Fourth Amendment issues the Court must resolve.  See Whren, 517 U.S. at 812-13.  Therefore, the undersigned respectfully recommends that the Court deny Nettles' motion to suppress to the extent it rests on his contention that he did not commit any traffic violation or that

---

[9] At the second hearing on Nettles' motion to dismiss Mr. Cohen as his attorney, Nettles appeared to argue that there was no stop sign in his direction of travel.  Officer Smith testified that he observed Nettles fail to stop while travelling south on Michigan.  The Google Maps information submitted by the government (Gov't Exh. 1) does not identify whether and where any stop signs are located at the intersection of Michigan and Davis.  The undersigned may take judicial notice of historical map information located in Google Maps.  See Global Control Systems, Inc. v. Luebbert, 2015 WL 753124 at *1 n.2 (W.D. Mo. Feb. 23, 2015) (taking judicial notice of Google Maps information where no party adduced certain information) (citations omitted); see also Cheval Int'l v. SmartPak Equine, LLC, 2015 798968 at *4 (D.S.D. Feb. 26, 2015) (citations omitted); but see Jackson v. Allstate Ins. Co., 785 F.3d 1193, 1204 (8th Cir. 2015) (finding no abuse of discretion in declining to take judicial notice of a Google Maps printout regarding drive time estimates).  The undersigned has considered the street view of Google Maps for the intersection of Michigan and Davis (see Google Maps, www.maps.google.com last visited May 26, 2021).  The view depicted in Google Maps shows a stop sign consistent with Officer Smith's testimony.  To be clear, the undersigned credited Officer Smith's testimony independent of any Google Maps information concerning the location of stop signs.  The undersigned referred to Google Maps street view solely because of an issue Nettles raised, pro se, after the evidentiary hearing had concluded and post-hearing memoranda had been submitted.  Nettles' contention regarding the stop sign was made in the context of his arguments suggesting that his attorney had rendered deficient assistance.  The Google Maps information refutes any contention that there was no stop sign in the direction of travel.  Furthermore, and entirely apart from any Google Maps street view information, the government submitted evidence that Nettles pled guilty to the traffic violation, which also undercuts Nettles' contention that did not commit a traffic violation.  (Gov't Exh. 4)

the traffic stop was merely pretextual and conducted in concert with a narcotics investigation.[10]

**B.    Was the Vehicle Search Constitutional?**

The fact that the traffic stop was constitutional does not resolve the question of whether the search was also constitutional.  It is not disputed that the police did not get a warrant before searching the Chevrolet Malibu and Nettles did not consent to any search of the vehicle.

"A search generally requires a warrant to pass muster under the Fourth Amendment…. Warrantless searches, however, can satisfy our Constitution if they fit within an exception to the warrant requirement….  The automobile exception is one of these, allowing an officer to legally search a vehicle if he has probable cause."  United States v. McGhee, 944 F.3d 740, 742 (8th Cir. 2019) (per curiam) (citations omitted).  Pursuant to the automobile exception, "[a]s long as the law enforcement officials have probable cause, they may search an automobile without a warrant…."  United States v. Dunn, 928 F.3d 688, 693(8th Cir. 2019) (citation and quotation omitted); see also Carroll v. United States, 267 U.S. 132, 160-62 (1925).  The Eighth Circuit has explained that the odor of marijuana from a car may provide probable cause to conduct a warrantless search of an automobile.  See United States v. Walker, 840 F.3d 477, 483-84 (8th Cir. 2016); United States v. Brown, 634 F.3d 435, 438 (8th Cir. 2011).

In this context, timing matters.  It is well-established that the police may not delay or

---

[10] Nettles mentions that Officer Smith testified that he would have conducted an investigatory stop of Nettles had he not observed any traffic violation.  Arguably, the radio traffic included on Gov't Exh. 5 supplies reasonable suspicion sufficient to conduct an investigatory stop of the Malibu, regardless of any traffic violation.  See Terry v. Ohio, 392 U.S. 1 (1968); McElree v. City of Cedar Rapids, et al., 983 F.3d 1009, 1015 (8th Cir. 2020) ("As a standard for initiating an investigative stop, reasonable suspicion hovers well below preponderance of the evidence and need not rise to the level of probable cause.") (citing United States v. Arvizu, 534 U.S. 266, 274 (2002)); see also United States v. Evans, 830 F.3d 761, 766 (8th Cir. 2016) (citation omitted).  The radio traffic over the Narc-Vice channel provided more than just a hunch that the driver of the Malibu was involved in criminal activity.  The fact that Office Smith observed a stop sign violation renders this issue irrelevant.

prolong a traffic stop beyond the time needed to address the basis of the stop and "attend to related safety concerns." United States v. Sanchez, 955 F.3d 669, 674 (8th Cir.) (citations and quotations omitted), cert. denied, 141 S. Ct. 930 (2020).  But if the officer conducting the stop "discovers information leading to reasonable suspicion of an unrelated crime," that officer may lawfully "extend the stop and broaden the investigation" to confirm or dispel that suspicion. United States v. Woods, 829 F.3d 675, 679 (8th Cir. 2016); see also United States v. Williams, 929 F.3d 539, 544, 545 (8th Cir. 2019).

In this case, Officer Smith credibly testified that he smelled marijuana odor as he approached Nettles' vehicle.  Thus, at the outset, before there was a chance to complete the routine tasks related to a traffic stop, Officer Smith discovered information that would provide at least a reasonable suspicion of an unrelated crime.  And the odor of marijuana was not the only articulable fact available to Officer Smith.  He was also aware that Nettles had recently departed from a location at which other officers had observed suspected narcotics related activity.  Moreover, Officer Smith credibly testified that he observed Nettles make furtive movements, as if Nettles was trying to conceal something.  On these facts, the undersigned finds that Officer Smith had probable cause to search the Chevrolet Malibu pursuant to the automobile exception. See United States v. Zamora-Garcia, 831 F.3d 979, 983 (8th Cir. 2016) ("A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present.") (quoting Florida v. Harris, 133 S. Ct. 1050, 1055 (2013)).[11]

---

[11] Having concluded that Officer Smith had probable cause to search Nettles' vehicle, he also could seize the firearm and narcotics evidence pursuant to the plain view doctrine.  See United States v. Williams, 951 F.3d 892, 896 (8th Cir. 2020); United States v. Poe, 462 F.3d 997, 1001 (8th Cir. 2006).

Therefore, the undersigned respectfully recommends that the Court deny Nettles' motion to suppress to the extent he contends that the traffic stop was extended unconstitutionally or that the police lacked probable cause to search his vehicle.

**C.    <u>Other Considerations</u>**

The government offers two additional justifications for the car search.  In its post-hearing memorandum, the government argues that, even if the initial traffic stop was unconstitutional, Nettles was arrested on the outstanding domestic assault wanted.  The government suggests that, pursuant to <u>Utah v. Strieff</u>, 136 S. Ct. 2056 (2016), the preexisting wanted would attenuate the taint of an unlawful stop and the evidence would have been inevitably discovered.

The <u>Strieff</u> decision involved an outstanding warrant, not a wanted.  A wanted is not a substitute for a judicially authorized arrest warrant; it is a police-created record.  Our Court has explained that "wanteds are a type of warrantless arrest, and therefore permissible only if the wanted is based on probable cause." <u>Furlow v. Belmar et al.</u>, 4:16 CV 254 HEA, 2019 WL 1227460 at *1 (Mar. 15, 2019).  The government offers no caselaw in which any court has extended <u>Strieff</u> to wanteds.  And even if such case law exists, the present record would not allow our Court to decide if the felony wanted was supported by probable cause, reasonable suspicion, or just a hunch.  Therefore, the undersigned recommends that the Court not consider the government's alternative argument pursuant to <u>Strieff</u>.

The government's other alternative argument is stronger.  The government contends that the police could search the Malibu for safety purposes based on Nettles' furtive movements.  Although the undersigned has concluded that the police had ample probable cause to search the Chevrolet Malibu pursuant to the automobile exception, for completeness and to facilitate further review of the issues raised, the undersigned will address this additional justification.

"Traffic stops are inherently fraught with danger to police officers, 'so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely.'" United States v. Warren, 984 F.3d 1301, 1305 (8th Cir. 2021) (quoting United States v. Hensley, 469 U.S. 221, 235 (1985)), petition for cert. docketed, No. 20-7742 (Apr. 14, 2021). "During a lawful traffic stop, officers can take actions that are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" Id. at 1304 (quoting Rodriguez v. United States, 575 U.S. 348 (2015)). During a valid traffic stop, police officers may order the driver out of the vehicle. See Pennsylvania v. Mimms, 434 U.S. 106 (1977). Similarly, during a valid traffic stop, police officers may conduct a limited search of the motorist and the vehicle for weapons if the officers have a reasonable belief that the motorist may pose a danger. See Michigan v. Long, 463 U.S. 1032, 1050 (1983). As the Eighth Circuit has explained "when police officers have reasonable suspicion to conclude that the driver of a car is armed and dangerous, they are entitled to search not only the driver's person but also the driver's car for any weapons that might endanger the officers." United States v. Scott, 818 F.3d 424, 430 (8th Cir. 2016) (discussing Long, 463 U.S. at 1045-52).

In this case, a protective search of Nettles and his car was permissible because Officer Smith had reasonable articulable suspicion to believe that Nettles might pose a risk to officer or public safety.[12] Officer Smith credibly testified that Nettles did not immediately curb his vehicle

---

[12] It does not matter that Nettles was ultimately arrested or that he had been removed from the vehicle and restrained. See United States v. Stewart, 631 F.3d 453, 457 (8th Cir. 2011) ("[I]t is settled that once reasonable suspicion is established, a protective search of a vehicle's interior is permissible regardless of whether the occupants have been removed from the vehicle."); Scott, 818 F.3d at 432 (quoting same); see also United States v. Morgan, 729 F.3d 1086, 1089-90 (8th Cir. 2013) (noting the continued viability of Michigan v. Long even after the Supreme Court's decision in Arizona v. Gant, 556 U.S. 332 (2009)). The facts of Nettles' case demonstrate why such a search remains necessary. Here, the Chevrolet Malibu was not towed or impounded, but rather the police relinquished it to the father of Nettles' girlfriend.

when the police initiated the traffic stop. Officer Smith also credibly testified that, as he approached the vehicle, he observed Nettles making movements consistent with someone trying to conceal something. These facts must be considered in view of the circumstance that narcotics detectives had observed Nettles in the area of suspected drug trafficking activity. All of these facts and circumstances were known to Officer Smith at the outset of the traffic stop. Therefore, even discounting the odor of marijuana from the vehicle, Officer Smith was aware of numerous, articulable facts to justify extending the traffic stop to conduct a protective search of Nettles and the Chevrolet Malibu.[13]

## **RECOMMENDATION**

Accordingly,

**IT IS HEREBY RECOMMENDED** that Nettles' Motion to Suppress [ECF No. 57] be DENIED.

The parties are advised that they have fourteen (14) days in which to file written objections to the foregoing Report and Recommendation unless an extension of time for good

---

[13] This conclusion is important because Nettles was initially arrested on domestic assault "wanted." As a result of that arrest, Officer Smith recovered marijuana from Nettles' pants pocket. A wanted is not a warrant and, therefore, the police could only arrest Nettles if they had probable cause to believe he committed a crime. See Furlow, 2019 WL 1227460 at *1. There is presently no evidence before the Court to show that Nettles committed any domestic assault. Thus, the undersigned cannot say whether the police had probable cause to arrest Nettles for domestic assault. In this case, however, Officer Smith could still search Nettles for two reasons. First, as noted, Officer Smith testified that he observed Nettles make furtive movements as he approached the vehicle. Relatedly, Officer Smith smelled marijuana and knew that Nettles recently left the scene of suspected drug activity. Thus, Officer Smith could have detained and searched Nettles pursuant to Michigan v. Long and related cases. See Scott, 818 F.3d at 430. Second, as also noted, the police had probable cause to search the Malibu. Therefore, even without the domestic assault wanted, the police would have arrested Nettles upon recovering the firearm and drug materials from the vehicle he was driving. The marijuana in Nettles' pants would have been inevitably discovered. See Strieff, 136 S. Ct. at 2061 ("[T]he inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source.") (citing Nix v. Williams, 467 U.S. 431, 443-44 (1984)).

cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).  see also 28 U.S.C. § 636(b)(1)(A), Fed. R. Crim. P. 59(a).

This matter will be set by further order of the Court, before the Honorable Audrey G. Fleissig, United States District Judge.

/s/ *John M. Bodenhausen*

JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this  7th   day of June, 2021.